# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 8145 | **DATE** | 2/27/2003 |
| **CASE TITLE** | LaSalle Business Credit, Inc. v. Morton M. Lapides, Sr. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated in the attached memorandum opinion and order, LaSalle's motion for summary judgment [74-1] is GRANTED in its entirety and LaSalle's motion to strike the jury demand [79-1] is DENIED as moot. Judgment is hereby entered in favor of LaSalle and against Lapides Sr. on LaSalle's Guaranty Complaint in the amount of $6,925,890.13. In addition, summary judgment is hereby entered in favor of LaSalle and against Lapides Sr. on the Counterclaim. This case is closed.

(11) ■ [For further detail see attached memorandum opinion and order.]

| | No notices required, advised in open court. | | number of notices | | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | | | |
| | Notices mailed by judge's staff. | | MAR 0 3 2003 | | |
| | Notified counsel by telephone. | | MAR date docketed 2003 | | |
| ✓ | Docketing to mail notices. | | | | 100 |
| | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | |
| mds(lc) | courtroom deputy's initials | | date mailed notice | | |

U.S. DISTRICT COURT
CLERK
03 FEB 28 PM 4: 05

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| LASALLE BUSINESS CREDIT, INC., | ) | |
| | ) | |
| Plaintiff, | ) | No. 00 C 8145 |
| | ) | |
| v. | ) | HONORABLE DAVID H. COAR |
| | ) | |
| MORTON M. LAPIDES, SR., | ) | |
| | ) | |
| Defendant. | ) | |

**DOCKETED**

MAR 0 3 2003

### MEMORANDUM OPINION AND ORDER

LaSalle Business Credit, Inc. ("LaSalle") sues Morton M. Lapides, Sr. ("Lapides Sr.") for

breach of contract arising from a Loan Agreement and Guaranty between the parties. Lapides Sr.

filed a counterclaim against LaSalle, alleging tortious interference, economic duress, and civil

conspiracy and asserting his affirmative defenses to the complaint. On March 5, 2002, this Court

dismissed Counts II-V of Lapides Sr.'s counterclaim; only Count I, the tortious interference

claim, remains. Before this Court is LaSalle's motion for summary judgment in its favor on the

Complaint and the Counterclaim. Concurrently before this Court is LaSalle's motion to strike

Lapides Sr.'s jury demand. For the following reasons, LaSalle's motion for summary judgment

is GRANTED in its entirety and its motion to strike the jury demand is DENIED as moot.

### I. Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.

1



R. Civ. P. 56(c); U.S. v. First Nat. Bank of Cicero, 957 F.2d 1362, 1365 (7th Cir. 1992). A genuine issue of material fact exists for trial when, in viewing the record and all reasonable inferences drawn from it in a light most favorable to the non-movant, a reasonable jury could return a verdict for the non-movant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Fritcher v. Health Care Servs. Corp., 301 F.3d 811, 815 (7th Cir. 2002).

The movant bears the burden of establishing that no genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931 (7th Cir. 1995). If the movant meets this burden, the non-movant must set forth specific facts that demonstrate the existence of a genuine issue for trial. Rule 56(e); Celotex, 477 U.S. at 324. A scintilla of evidence in support of the non-movant's position is insufficient, and the non-movant "must do more than simply show that there is some metaphysical doubt as to the material fact." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see also Anderson, 477 U.S. at 250. Weighing evidence, determining credibility, and drawing reasonable inferences are jury functions, not those of a judge deciding a motion for summary judgment. Anderson, 477 U.S. at 255.

## II. Background

The following facts are taken from the parties Local Rule 56.1 materials.[1] LaSalle, a

---

[1] Unless otherwise indicated by a showing of disagreement, the facts listed below are either undisputed or deemed admitted by Lapides Sr. because Lapides Sr.'s Response to LaSalle's Local Rule 56.1 Statement either 1) inappropriately denied the material fact by citing to an exhibit that agreed with LaSalle's statement of material facts, or 2) was unsupported by proper citation that specifically referred to the record, affidavits, or other supporting materials relied upon for disagreement, as required by Local Rule 56.1(b)(3)(A) and (B), which this Court strictly enforces. Further, as Local Rule 56.1(b) requires a responding party to submit "a statement, consisting of short numbered paragraphs, of any additional *facts* that require the denial of summary judgment . . ." (emphasis added), this Court disregards Lapides Sr.'s

lending institution, is a Delaware corporation with its principal place of business in Chicago, Illinois. Lapides, Sr. is an individual who resides in Annapolis, Maryland. Valley Rivet Company, Inc. ("VRC") is an Illinois corporation with its principal place of business in Annapolis, Maryland. VRC is a wholly owned subsidiary of VR Holdings, Inc. ("VRH"), a Delaware corporation with its principal place of business in Annapolis, Maryland. VRH is owned by several members of the family or family trusts related to and including Lapides, Sr.

### The Loan Agreement

On or about May 24, 1999, VRC and La Salle entered into a Loan and Security Agreement (as amended, modified and supplemented, the "Loan Agreement") and certain related agreements (collectively with the Loan Agreement, the "Loan Documents"). The Loan Agreement provided for Term Loans aggregating $9.1 million, a capital expenditure loan facility of up to $1 million, a letter of credit facility of up to $250,000 and a Revolving Loan of up to $5.5 million. Under the Loan Agreement and subject to its other terms and conditions, LaSalle agreed to make Revolving Loans to VRC up to the lesser of:

(i) an amount equal to the sum of: (A) up to eighty-five percent (85%) of the face amount of Eligible Accounts plus, (B) the lesser of (x) up to sixty percent (60%) of the value of Eligible Inventory, calculated on the basis of the lower of cost or market value on a first-in, first-out basis, and (y) Two Million Five Hundred Thousand Dollars ($2,500,000), in each case, less such

---

statements that were supported by allegations in his Counterclaim rather than facts. See First Nat. Bank of Cicero, 957 F.2d at 1367 (stating that a party "may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations that there is a *genuine* issue of material fact which requires trial"). Thus, LaSalle's motion to strike Lapides Sr.'s Local Rule 56.1 Responses is denied as moot because inappropriate arguments, statements that are not supported by the record or that are supported with allegations rather than facts, or that are supported with citations to entire affidavits are disregarded. See Johnson v. Indopco, Inc., 887 F.Supp. 1092, 1095 (N.D. Ill. 1995). "[D]istrict courts are not obliged in our adversary system to scour the record looking for factual disputes . . . ." Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 9?? (7th Cir. 1994).

reserves as LaSalle elects to establish from time to time in the exercise of its sole discretion (including without limitation a reserve for coating and processing Inventory) minus the outstanding amount of all Letter of Credit Obligations; or

(ii) the Revolving Loan Commitment, minus the outstanding amount of all Letter of Credit Obligations.

The Loan Agreement provided that LaSalle could establish reserves as it elected from time to time in the exercise of its sole discretion. Section 5(a) of the Loan Agreement sets forth the interest chargeable on the Loans:

At Borrower's election, except as otherwise provided in paragraph 6(c) hereof, interest shall accrue on: (A) the unpaid principal balance of each Term Loan and Capital Expenditure Loan made to Borrower outstanding at the end of each day at (x) a fluctuating rate per annum equal to one-quarter of one percent (0.25%) above the Prime Rate or (y) a fixed rate per annum equal to two and one-half percent (2.50%) above the LIBOR Rate; and (B) the principal amount of the Revolving Loans made to Borrower outstanding at the end of each day at (x) a fluctuating rate per annum equal to one-quarter of one percent (0.25%) above the Prime Rate or (y) a fixed rate per annum equal to two and one-half percent (2.50%) above the LIBOR Rate.... Upon and after the occurrence of an Event of Default, and during the continuation thereof, the principal amount of all Loans shall bear interest on demand at a rate per annum equal to (1) with respect to each Term Loan and Capital Expenditure Loan, the rate of interest then in effect under paragraph 5(a)(A) plus two percent (2%) and (2) with respect to Revolving Loans, the rate of interest then in effect under paragraph 5(a)(B) plus two percent (2%).

Under the Loan Agreement, VRC agreed to pay LaSalle's audit fees and expenses:

In addition to the costs and expenses described in paragraph 14(c) hereof, Borrower shall pay to LaSalle an examination fee of Six Hundred Dollars ($600) per day per person for each examination performed by or at LaSalle's direction of Borrower's books and records and Collateral and such other matters as LaSalle shall deem appropriate in its commercially reasonable judgment, each such fee to be paid upon the completion of each such examination, together with LaSalle's out-of-pocket costs and expenses in connection therewith; provided, that so long as no Event of Default exists, Borrower shall not be liable for more than four (4) such examinations per calendar year or for examination fees and out-of-pocket expenses in connection therewith in excess of Ten Thousand Dollars ($10,000) in the aggregate in any calendar year.

VRC also agreed to take all actions to preserve the Collateral as LaSalle may have requested:

> Borrower shall, at LaSalle's request, at any time and from time to time, execute and deliver to LaSalle such financing statements, documents and other agreements and instruments (and pay the cost of filing or recording the same in all public offices deemed reasonably necessary or desirable by LaSalle) and do such other acts and things as LaSalle may deem necessary or desirable in order to establish and maintain a valid, attached and perfected security interest in the Collateral in favor of LaSalle (free and clear of all other liens, claims and rights of third parties whatsoever, whether voluntarily or involuntarily created, except Permitted Liens) to secure payment of the Liabilities, and in order to facilitate the collection of the Collateral.

Under the Loan Agreement, VRC agreed to provide specific reporting to LaSalle:

| Time Period | Type of Report |
|---|---|
| Each day on which VRC requested a Revolving Loan and at least weekly | Daily loan report and certificate, sales journal, cash receipts journal, and credit memo journal |
| Monthly | Statement of income, statement of cash flow, balance sheet and a chart comparing such statements of income and balance sheets to those in the corresponding periods in the preceding Fiscal Year |
| Monthly | Detailed trial balance of Borrower's Accounts aged per invoice date, the names and addresses of all Account Debtors of VRC, a summary and detail of accounts payable, the general ledger inventory account balance, a perpetual inventory report and LaSalle's standard form of Inventory Report |
| Annual | Statement of income, balance sheet, statement of cash flow, projected balance sheets, projected statement of income and projected cash flow |

Further, certain reporting had to be conducted by accountants acceptable to LaSalle:

As soon as practicable and in any event within ninety (90) days after the end of each Fiscal Year of Borrower: (a) statements of income of Borrower for such Fiscal Year, and a balance sheet of Borrower as of the end of such Fiscal Year, and (2) statements of cash flow of Borrower for such Fiscal Year, such statements to be presented in accordance with GAAP and certified by Mooney & Thomas PC or an independent certified public accountants [sic] of recognized national standing selected by Borrower and satisfactory to LaSalle, whose opinion shall be unqualified, in form and substance reasonably satisfactory to LaSalle. . . .

Under the Loan Agreement, VRC agreed that LaSalle could inspect the Collateral and VRC's books and records, could speak with VRC's employees and accountants, at VRC's cost and expense, and could require VRC to furnish additional information relating to its financial condition at any time:

LaSalle, or any Persons designated by it, shall have the right, at any time, in the exercise of its commercially reasonable credit judgment, to call at Borrower's places of business at any reasonable times, and, without hindrance or delay, to inspect the Collateral and to inspect, audit, check and make extracts from Borrower's books, records, journals, orders, receipts and any correspondence and other data relating to Borrower's business, the Collateral or any transactions between the parties hereto, and shall have the right to make such verification concerning Borrower's business as LaSalle may consider reasonable under the circumstances. Borrower shall furnish to LaSalle such information relevant to LaSalle's rights under this Agreement as LaSalle shall at any time and from time to time reasonably request. Borrower authorizes LaSalle to discuss the affairs, finances and business of Borrower with any officers or directors of Borrower or any Affiliate, or with those employees of Borrower with whom LaSalle has determined in its commercially reasonable judgment to be necessary or desirable to converse, and to discuss the financial condition of Borrower with Borrower's independent public accountants. Any such discussions shall be without liability to LaSalle or to such accountants. Borrower shall pay to or reimburse LaSalle for all reasonable fees, costs, and out-of-pocket expenses incurred by LaSalle in the exercise of its rights hereunder (in addition to the fees payable by Borrower pursuant to paragraph 5(g) hereof in connection with LaSalle's examination of Borrower's books and records and Collateral) and all of such costs, fees and expenses shall constitute Revolving Loans hereunder, shall be payable on demand and, until paid, shall bear interest at the highest rate then applicable to Loans hereunder; . . . .

The Loan Agreement provided LaSalle with rights and remedies upon the occurrence of an Event of Default:

> (a) Upon the occurrence of an Event of Default described in paragraph 16(e) hereof, all of the Liabilities shall immediately and automatically become due and payable, without notice of any kind. Upon the occurrence of any other Event of Default, all of the Liabilities may, at the option of LaSalle, and without demand, notice or legal process of any kind, be declared, and immediately shall become, due and payable.
> (b) Upon the occurrence of an Event of Default, LaSalle may exercise from time to time any rights and remedies available to it under the Uniform Commercial Code and any other applicable law in addition to, and not in lieu of, any rights and remedies expressly granted in this Agreement or in any of the Other Agreements and all of LaSalle's rights and remedies shall be cumulative and non-exclusive to the extent permitted by law.

In order to constitute "Eligible Inventory" under the Loan Agreement, Inventory could not be (among other things):

> stored with a bailee, consignee, warehouseman, processor or similar party unless LaSalle has given its prior written approval and Borrower has caused any such bailee, consignee, warehouseman, processor or similar party to issue and deliver to LaSalle, in form and substance acceptable to LaSalle, such UCC financing statements, warehouse receipts, waivers and other documents as LaSalle shall require . . . .

Thus, any inventory of VRC that was stored with a bailee, consignee, warehouseman, processor or similar party (the "Vendor Inventory") was not initially included in Eligible Inventory, and was not therefore initially included in the Borrowing Base.[2]

### VRC's Inventory & Management

VRC did not have a perpetual Inventory system. Therefore, under the Loan Agreement, VRC had to provide documentation (the "Bailee letters") required under the definition of Eligible

---

[2] The Vendor Inventory that was excluded from the initial Borrowing Base determination constituted 10% of total inventory.

Inventory from all the vendors of the Vendor Inventory in order for the Vendor Inventory to be included in the Borrowing Base. Only after VRC provided all the Bailee letters, could the Vendor Inventory be included in the Borrowing Base. VRC sent LaSalle the Bailee Letters between September and November 1999, LaSalle received the final Bailee Letter from VRC on November 15, 1999, and on that date, LaSalle promptly included the Vendor Inventory in the Borrowing Base.

Between 1996, when Morton M. Lapides, Jr. ("Lapides Jr.") joined VRC, and September 30, 1999, he handled business development, including sales and marketing, and operational oversight, including inventory issues. By July 1999, Lapides Jr. first learned that Charles Neidlinger ("Neidlinger"), then-President of VRC, was not properly performing his job, particularly with respect to accounts receivable that were over 90 days old. On September 30, 1999, Lapides Jr., Neidlinger, Jeffrey Lapides and Bill Uraski participated in a meeting to discuss performing the year-ended September 30, 1999 physical Inventory count. At the September 30, 1999 meeting, Lapides Jr. advised Neidlinger that Neidlinger would not be participating in the physical Inventory count because under Neidlinger's supervision, the Inventory had been generally disorganized and mislabeled. During the September 30, 1999 meeting, Neidlinger resigned abruptly. Thereafter, Lapides Jr. took over as President of VRC. Subsequent to Neidlinger's resignation, Lapides Jr. and his staff confirmed that overstatements of VRC's Inventory had occurred for many years, that Neidlinger had orchestrated misstatements of VRC's receivables, and that Neidlinger had improperly used VRC funds for his own benefit. At one point during the investigation, Lapides Jr. questioned whether pages of a physical Inventory count were missing because the numbers "were less than we thought they would be." Lapides Jr.

ultimately determined that Neidlinger had improperly charged unauthorized personal expenses to VRC in the approximate amount of $10,000 per month and had orchestrated a $2.2 million material overstatement of VRC's Inventory between 1996 and 1999.

Lapides Jr. believed Mooney & Thomas, VRC's outside accounting firm, had been "hoodwinked" by Neidlinger and that it was negligent with respect to the misstatements of VRC's Inventory. As a result of the overstatement of VRC's Inventory and Accounts, VRC was in default of certain financial covenants, which constituted an Event of Default under the Loan Agreement.

On December 2, 1999, VRC met with LaSalle officers (the "December 2 Meeting") to request that LaSalle change the loan officer assigned to the VRC account and to notify LaSalle of the material overstatements of the Inventory and accounts receivable. Prior to this December 2, 1999 meeting, VRC did not advise LaSalle, either orally or in writing, of the reasons for Neidlinger's resignation, that a new plant manager had been hired or that the accounts receivable and Inventory had been materially overstated. Between September 30, 1999 and December 2, 1999, VRC continued to submit Daily Loan Reports to LaSalle which evidenced a fluctuating Inventory number used in calculating the Borrowing Base.[3] Because of the overstatements of the accounts receivable and Inventory (which have a direct effect on the amount of availability under the Revolving Loans), VRC borrowed more money than was permitted under the Loan Agreement. After the December 2 Meeting, LaSalle, in accordance with the Loan Agreement, implemented a $5,000 per day reserve to reduce the existing overadvance. On December 7,

_____

[3] LaSalle states that there was no justification for any reporting of Inventory numbers, given the known inaccuracies in the Inventory system; Lapides, however, states that Lapides Jr. did not suspect that inventory had been significantly overstated until late November 1999.

1999, officers of VRC and LaSalle attended a meeting (the "December 7 Meeting") at VRC's plant in Aurora, Illinois. At that time, LaSalle toured the plant, and afterward made certain demands. Namely, LaSalle requested: (a) an audited balance sheet as of December 31, 1999, using an auditor other than Mooney & Thomas; (b) an immediate valuation of VRC's inventory; (c) information regarding the separate insurance claims against VRC's former CEO and outside auditor; (d) the payment for LaSalle's field examiner to remain on-site at the VRC plant; (e) weekly cash flow budgets; (f) a crisis manager and VRC's expense; (g) telephonic verification of VRC's accounts receivables; (h) the establishment of a $5,000 a day reserve as initially discussed at the December 2 Meeting; and (i) that VRC maintain direct communication with the former auditing firm and with Neidlinger. Further, sometime after the December 7 Meeting, LaSalle also threatened not to fund payroll because no funds were available given the Event of Default and no forbearance agreement had been reached.

On December 13, 1999, LaSalle sent an agreement to VRC asking that VRC countersign the agreement acknowledging that VRC was in default of the Credit Facility. VRC refused to sign this letter until its counsel reviewed it. On December 27, 1999, LaSalle sent VRC a Notice of Default letter (the "12/27 Default Letter"). In the 12/27 Default Letter, LaSalle advised VRC that it would begin charging the default rate of interest (2% above the non-default rate) in accordance with the Loan Agreement. LaSalle also stated in that letter that it was under no obligation to make any further loans under the Credit Facility, and that it could make any further advances in its sole discretion and without waiving the defaults which had already occurred. On January 5, 2000, LaSalle requested that VRC submit daily a copy of its Daily Loan Report, a current payables listing, a list of checks cut and held, a report on critical cash needs, and also a

cash flow projection. VRC submitted this information on January 12, 2000.

## The Guaranty & Forbearance Agreements

On January 19, 2000, Lapides Sr. executed a Guaranty (the "Guaranty") in favor of

LaSalle. In the Guaranty, Lapides Sr. expressly agreed that sufficient consideration had been

given:

> WHEREAS, the extension and/or continued extension of credit, as aforesaid, by
> Lender is necessary and desirable to the conduct and operation of the business of
> [VRC] and will inure to the personal and financial benefit of the undersigned;
> NOW THEREFORE, for value received and in consideration of any Loan,
> advance, or financial accommodation of any kind whatsoever heretofore, now or
> hereafter made, given or granted to Borrower by Lender...

Pursuant to the Guaranty, Lapides Sr. unconditionally guaranteed payment of certain obligations

that VRC owed LaSalle:

> [Lapides] unconditionally guaranties the full and prompt payment when due,
> whether a maturity or earlier, by reason of acceleration or otherwise, and at all
> times thereafter of all of the "Specified Liabilities. .-and the Collection Costs [as
> defined in the Guaranty].

From January 19, 2000, until December 11, 2000, when VRC and VRH filed voluntary petitions

for protection under the U.S. Bankruptcy Code, LaSalle and VRC executed a total of 13

Forbearance Agreements.[4]

Between December 2, 1999, the date that VRC disclosed to LaSalle that it was in default

of the Loan Agreement, and January 19, 2000, the date the First Forbearance Agreement was

entered into, LaSalle was under no obligation to advance any funds to VRC. In the First

Forbearance Agreement, VRC agreed not to pay any management or consulting fees or

---

[4] Lapides Sr.'s states that, on many occasions, Lapides Jr. signed the Forbearance
Agreements to prevent LaSalle from cutting off additional funding, including payroll, as LaSalle
was under no obligation to advance additional funds once a Forbearance Agreement expired.

compensation to Lapides Sr. or Lapides Jr., distribute any dividends to VRH or make the $6,000

payment to Jeffrey Lapides or his affiliated JRL Partners during the period January 1, 2000

through January 31, 2000 and, to the extent that an Event of Default existed, after January 31,

2000. Subject to certain conditions, LaSalle also agreed to subordinate its lien on VRC's capital

stock to a lending institution that would make a loan to VRH, and to allow VRC to refinance

Term Loan A.

In a letter dated January 19, 2000, LaSalle agreed to waive the prepayment fee under the

Loan Agreement. Further, in each of the Forbearance Agreements,[5] VRC released LaSalle:

> In consideration of the agreements of Lender contained herein and for other good
> and valuable consideration, the receipt and sufficiency of which is hereby
> acknowledged, Borrower, on behalf of itself and its successors, assigns, and other
> legal representatives, hereby absolutely, unconditionally and irrevocably releases,
> remises and forever discharges Lender, and its successors and assigns, and its
> present and former shareholders, affiliates, subsidiaries, divisions, predecessors,
> directors, officers, attorneys, employees, agents and other representatives (Lender
> and all such other Persons being hereinafter referred to collectively as the
> "Releasees" and individually as a "Releasee"), of and from all demands, actions,
> causes of action, suits, covenants, contracts, controversies, agreements, promises,
> sums of money, accounts, bills, reckonings, damages and any and all other claims,
> counterclaims, defenses, rights of set-off, demands and liabilities whatsoever
> (individually, a "Claim" and collectively, "Claims") of every name and nature,
> known or unknown, suspected or unsuspected, both at law and in equity, which it
> or any of its successors, assigns, or other legal representatives may now or
> hereafter own, hold, have or claim to have against the Releasees of any of them
> for, upon, or by reason of any circumstance, action, cause or thing whatsoever
> which arises at any time on or prior to the day and date of this Agreement,
> including, without limitation, for or on account of, or in relation to, or in any way
> in connection with any of the Loan Agreement or any of the Other Agreements or

---

[5] The First Forbearance Agreement, the First Amendment, the Second Amendment, the
Third Amendment, the Fourth Amendment, the Fifth Amendment, the Sixth Amendment, the
Seventh Amendment, the Eighth Amendment, the Ninth Amendment, the Second Forbearance
Agreement, Amendment 1 to Second Forbearance Agreement and Amendment 2 to Forbearance
Agreement (as defined below) are collectively referred to herein as the "Forbearance
Agreements," and each a "Forbearance Agreement."

transactions thereunder or related thereto.

At the time that each of the subsequent Forbearance Agreements was entered into, Lapides Sr. reaffirmed the terms and conditions of the Guaranty. In each of the Forbearance Agreements, VRC acknowledged the occurrence of the Existing Defaults (as defined therein), which constituted Events of Default under the Loan Agreement. In each of the Forbearance Agreements, LaSalle agreed to forbear until a date certain from exercising its rights and remedies under the Loan Agreement against VRC due to the Existing Defaults (as defined therein); after such date certain, if the Events of Default had not been cured and no subsequent Forbearance Agreement had been entered into, LaSalle had no obligation to make any further funds available and could exercise its rights and remedies under the Loan Agreement.

There were several amendments to the First Forbearance Agreement. In the First Amendment and the Second Amendment, VRC agreed that any investments, contributions, loan advances or other payments that VRC received from Lapides Sr. or his "Affiliates" would not be repaid or redeemed until the Liabilities owing to LaSalle were paid in full. In the Fifth Amendment, VRC agreed to provide to LaSalle by May 5, 2000, one or more financing commitments to refinance the Liabilities. Also in the Fifth Amendment, VRC agreed to pay LaSalle a $10,000 amendment fee in consideration for LaSalle entering into the amendment. In the Seventh Amendment, VRC agreed to an interest rate of the prime rate plus 3.25% on the Loans and it agreed to defer the date on which principal payments for any Term Loan or a Capital Expenditure Loan were due from the first day of each month to the tenth day of such month. In the Eighth Amendment, VRC agreed to pay LaSalle a $5,000 accommodation fee in consideration for LaSalle entering into the amendment. In the Ninth Amendment, VRC agreed to

an interest rate of the prime rate plus 4.0% on the Loans, and it agreed that it could pay the $125,000 principal installment payment for Term Loan C due on July 10, 2000, in two separate payments: $83,333.33 on July 10, 2000 and $41,666.67 on June 10, 2001. Also in the Ninth Amendment, VRC agreed to pay LaSalle a $5,000 accommodation fee in consideration for LaSalle entering into the amendment.

In the Second Forbearance Agreement, LaSalle agreed to defer the dates on which the monthly installments of principal of any Term Loan or Capital Expenditure Loan were due between September 1, 2000 and November 15, 2000, to November 15, 2000. LaSalle also agreed to reduce the interest rate to the prime rate plus 1% on the Loans between September 1, 2000 and November 15, 2000, and to defer the payment by VRC of the interest due and owing of the prime rate plus 3% to November 15, 2000. In addition, VRC agreed to: (1) engage on or before September 25, 2000, a financial consultant satisfactory to LaSalle; (2) pay a deferred accommodation fee in the amount by which $200,000 exceeded the interest charges accrued on the Loans between September 1, 2000 and November 15, 2000, in consideration for LaSalle entering into the new forbearance agreement; (3) deliver to LaSalle by October 9, 2000, bona fide proposal letters to consummate the Recapitalization Transaction (as defined therein) on or before November 15, 2000, (a deadline which VRC failed to meet); (4) deliver to LaSalle by October 31, 2000, bona fide commitment letters to provide the financing necessary to consummate the Recapitalization Transaction on or before November 15, 2000, (a deadline which VRC failed to meet); and (5) provide LaSalle with an Inventory report for the previous week on the Tuesday of each week. VRC also acknowledged in the Second Forbearance Agreement that it had committed additional Events of Default under the Loan Agreement in September 2000.

14

As with the First Forbearance Agreement, there were several amendments made to the Second Forbearance Agreement. In Amendment 1 to Second Forbearance Agreement, LaSalle agreed to defer the date on which VRC was to provide bona fide proposal letters for the Recapitalization Transaction from October 9, 2000 to October 20, 2000, a deadline which VRC again failed to meet. Also in Amendment 1 to the Second Forbearance Agreement, VRC agreed to pay to LaSalle a $10,000 amendment fee in consideration for LaSalle entering into the amendment. In Amendment 2 to the Second Forbearance Agreement, LaSalle agreed, subject to certain conditions, to defer the dates on which payment of monthly installments of principal for any Term Loan or Capital Expenditure Loan were due between September 1, 2000 and November 20, 2000, to November 20, 2000. Further, LaSalle agreed that interest due during the period between November 15, 2000 and November 20, 2000 would be payable on November 20, 2000, and that it would defer the date on which VRC was to provide bona fide proposal letters for the Recapitalization Transaction from October 20, 2000, to November 20, 2000. In Amendment 2 to Second Forbearance Agreement, VRC agreed to: (1) receive at least $200,000 of additional proceeds of subordinated indebtedness from Lapides or VRH on or before November 3, 2000; and (2) pay a $25,000 amendment fee in consideration for LaSalle entering into the amendment.

### The Relationship between LaSalle and VRC

Throughout the period of the Forbearance Agreements and Amendments, relations between VRC and LaSalle were strained. VRC complained to LaSalle on several occasions about the frequent reporting requirements that the Forbearance Agreements established, and it wanted to prioritize the reporting requirements so that VRC could also remain in business and

conduct its manufacturing and sales activities.[6] VRC contends that there were frequent

miscalculations regarding funding availability and at times VRC checks to suppliers and vendors

would bounce, creating increasingly strained relationships with suppliers, vendors, and

customers. LaSalle contends that the Borrowing Base was determined incorrectly because of

erroneous information that VRC prepared and supplied to LaSalle. VRC also contends that

LaSalle would refuse to release funds to VRC on several occasions.

Throughout 2000, LaSalle requested that VRC find another lender to refinance LaSalle.

In letters by Lapides Sr. dated December 28, 1999 and January 6, 2000, he requested the

opportunity to find a replacement lender under the Loan Agreement. Also in 2000, Lapides Sr.

contributed approximately $730,000 to VRC, which was intended to cover VRC's cash shortfalls.

In February 2000, Annapolis National Bank entered into a lending relationship with

Lapides Sr. and Pamela Lapides (the "Annapolis Loan"), the funds from which were loaned to

VRH which, in turn, loaned the funds to VRC. On February 14, 2000, VRH executed a

Revolving Loan Note promising to repay Lapides Sr. and Pamela Lapides the monies they loaned

pursuant to the Six-Month Loan Agreement.

The Revolving Loan Note dated February 14, 2000 specifically provided that:

PAYMENT OF THIS NOTE IS SUBORDINATED TO THE CLAIMS OF
LASALLE BUSINESS CREDIT, INC., PURSUANT TO THE TERMS OF
THAT CERTAIN SUBORDINATION AGREEMENT DATED AS OF APRIL
25, 2000, BETWEEN MORTON M. LAPIDES AND LASALLE BUSINESS
CREDIT, INC.

---

[6] Lapides Sr. contends that, on many weekends, VRC personnel worked through the
weekend preparing reports that LaSalle had required, only to be told on Monday that the reports
were in the wrong format or that they were no longer something that they wanted. LaSalle
disputes this contention.

The Subordination Agreement precluded Lapides Sr. from receiving any payments on the Six Month Loan Agreement or the Revolving Loan Note until LaSalle was paid in full under the Loan Agreement. In the Subordination Agreement, Lapides Sr. agreed that:

> [LaSalle] shall be entitled to manage and supervise its financial arrangements with [VRC] without affecting the validity or enforcement of this Agreement and without regard to the existence of any rights that [Lapides] may now or hereafter have in or to any of the assets of [VRC]."

In the Subordination Agreement, Lapides Sr. further agreed that:

> [LaSalle] shall have no liability to [Lapides] for, and [Lapides] waives any claim which [Lapides] may now or hereafter have against, [LaSalle] arising out of (i) any and all actions which [LaSalle] takes or omits to take (including without limitation . actions with respect to the occurrence of an Event of Default (as defined in the Loan Agreement)...."

Between December 10, 1999 and December 10, 2000, Lapides Sr. and Pamela Lapides received loan repayments in the amount of at least $204,000 under the Six-Month Loan Agreement and the Revolving Loan Note. Between December 10, 1999 and December 10, 1999, Lapides Sr. and Pamela Lapides received interest payments in the amount of at least $19,480.96 under the Six-Month Loan Agreement and the Revolving Loan Note. Lapides Sr. did not utilize the management consulting fee/salary that he received from VRC to repay the Annapolis Loan. Pamela Lapides repaid the entire Annapolis Loan with proceeds from an insurance policy, proceeds from the sale of certain artwork, and other cash.

In March 2000, VRC obtained a proposal from GE Capital for financing, which LaSalle refused to accept. The proposal required LaSalle to retain a $3.0 - $3.5 million subordinated note. In April 2000, VRH entered into a letter of interest to acquire QSN, a large international distributor of fastener products located in the Midwest. This acquisition required a $66 million

recapitalization, and Lapides Sr. contends that it would have included funds to repay LaSalle. VRH obtained a letter from a Minnesota-based investment company expressing interest in financing the QSN transaction. The letter stated: "This letter represents our initial, nonbinding indication of interest to finance both the acquisition of QSN and the recapitalization of VRC in conjunction therewith."

Lapides Sr. contends that the QSN transaction and its financing were contingent on the operations of VRC continuing to reflect the same level of revenues earnings that it was then realizing, and that, to sustain revenues, it was necessary for VRC to continue to have advances under the Loan Agreement and Forbearance Agreements. In July 2000, VRC requested that LaSalle waive amortization of principal payments for three months and reduce the interest rates from 3.75% above the non-default rate to 1% above the prime rate. LaSalle agreed to defer the dates on which the monthly installments were due between September 1, 2000 and November 15, 2000, to November 15, 2000. LaSalle also agreed to reduce the interest rate to the prime rate plus 1% on the Loans between September 1, 2000 and November 15, 2000, and to defer VRC's payment of the interest due and owing of the prime rate plus 3% to November 15, 2000. Notwithstanding that agreement, on July 31, 2000, the parties executed the Ninth Amendment to the First Forbearance Agreement, in which LaSalle raised the interest rates to the prime rate plus 4.0% on the Loans.

The owner of QSN, Art Wondrasek, requested that VRC keep the prospective transaction confidential, but LaSalle had requested that VRC provide it with information concerning the transaction. Therefore, on July 31, 2000, LaSalle entered into a Confidentiality Agreement with VRH in regard to the QSN transaction. Lapides Sr. contends that, within a few days, LaSalle

18

leaked the information about the QSN transaction to one of VRC's competitors, Reliant Fasteners, who was also a LaSalle client. LaSalle denies leaking this information. Even if LaSalle breached the Confidentiality Agreement, Lapides Sr. admitted that "[QSN] walked away from the deal but not from the breach of confidentiality." Rather, VRC's inability to maintain its levels of revenues and earnings ultimately resulted in the demise of the QSN transaction.

In addition to the March 2000 proposal from GE Capital, in August 2000, VRC proposed that another lender provide a loan to be secured by a second mortgage (behind LaSalle) on real property owned by VRC. LaSalle, however, did not agree to the proposal because LaSalle did not want to give up the equity in the loan, which the lender was demanding.

On August 17, 2000, LaSalle advised VRC about some options that VRC could consider with respect to its loan from LaSalle, noting that refinancing always remained an option. Lapides Sr.'s contends that these options included liquidation, bankruptcy, and a going-concern sale. LaSalle also introduced VRC to several prospective buyers, including some that were LaSalle's clients.

On August 24, 2000, Dratt Campbell, VRC's designated crisis manager company, resigned because VRC did not provide certain information about VRC and because VRC would be most effectively served by a professional who could work with VRC and Lapides Sr. on a full-time basis. Pursuant to the Loan Agreement and the Forbearance Agreements, VRC was required to hire a new consultant acceptable to LaSalle. According to Lapides Jr., the replacement crisis manager, Murray Lessinger, cost VRC over $100,000.

Under Lapides Jr.'s new management, VRC generated $1.7 million in revenues in August 2000. The internally-prepared financial statements indicated that, while the company was

19

marginally profitable that month, VRC's earnings had turned positive.

On October 25, 2000, LaSalle established a $10,000 per day reserve against availability in accordance with the Loan Agreement, so as to have a $44,000 reserve for real estate taxes that had not been paid, a $26,000 reserve for Inventory at outside locations for which VRC had not supplied a Bailee Letter, and a $26,000 sales representative Inventory reserve.

On November 2, 2000, a meeting was held at the offices of LaSalle's attorneys to discuss various issues, including VCR's desire to secure additional credit to maintain revenues for the financing of the QSN transaction. At that meeting, VRC advised LaSalle that VRH had recovered approximately $200,000 from the settlement of a lawsuit against the former CEO (Neidlinger) and the former auditor (Mooney & Thomas) (the "Insurance Recovery"). VRC told LaSalle that VRH, the policy holder, received the Insurance Recovery, and that VRH in turn had reduced a portion of the Lapides Loan. LaSalle asserted that VRC, not VRH, should have received the Insurance Recovery because VRC was the entity allegedly defrauded.

Also on November 2, 2000, LaSalle caused $92,000 of VRC checks to be returned because there was no Forbearance Agreement in place, as VRC missed its required benchmarks with respect to the QSN transaction in breach of the Second Forbearance Agreement. As a result, VRH readvanced to VRC the $200,000 it had received from the Insurance Recovery.

In November 2000, LaSalle informed VRC that it was now requiring that VRC produce daily inventory reports instead of weekly inventory reports. On November 20, 2000, VRC met with LaSalle officials at LaSalle's offices in Chicago. LaSalle requested a liquidation budget from VRC and stated that, given VRC's inability to obtain alternative financing or to obtain a commitment letter from any potential buyer, LaSalle did not expect any transaction to materialize

which would result in LaSalle being paid in full. LaSalle advised VRC that no availability existed under the Loan Agreement and that, without waiving any of its rights or remedies under the Loan Agreement or the Forbearance Agreements, it nevertheless agreed to make funds available which VRC allegedly used in part to fund payroll that was due.

On or about November 22, 2000, LaSalle requested a going-concern budget from VRC and referred to VRC several of its clients as potential buyers. Lapides Sr. contends that LaSalle told VRC that, if VRC reduced its sales and other staff, LaSalle would continue to fund VRC. LaSalle disputes this contention. On November 28, 2000, VRC provided a going-concern budget to LaSalle, which LaSalle rejected because of the budget's lack of financial detail. On or about November 30, 2000, VRC laid off 39 of its 114 employees and LaSalle provided funds to VRC for its December 1, 2000 payroll. Lapides Sr. contends that LaSalle directed VRC to lay off those employees; LaSalle disputes this contention.

On November 30, 2000, LaSalle sent VRC a Notice of Event of Default letter, advising VRC that the "Forbearance Period" (as defined therein) had terminated. Because the Forbearance Period had terminated, LaSalle was under no obligation to make additional funds available to VRC. On or about December 1, 2000, VRC provided LaSalle with the rolling going-concern budget. LaSalle agreed to fund up to $40,000 per day according to the rolling going-concern budget beginning Monday, December 4, 2000. LaSalle required VRC to submit a liquidating budge in order to receive funding after December 5, 2000.

On December 4, 2000, VRC sent LaSalle a list of vendors to be paid the $40,000 in funds. VRC informed LaSalle that it would submit a similar list of vendors to be paid up to $40,000 on the following day. On December 5, 2000, LaSalle received a vendor list from VRC,

21

but LaSalle did not fund $40,000 to VRC for these vendors because LaSalle did not receive the liquidation budget that VRC had agreed to provide by December 5, 2000. LaSalle informed VRC that it would provide no more funding to VRC until VRC provided LaSalle with the requested liquidation budget.

On December 5, 2000, VRC senior officers were conducting tours of the company's plant facilities with potential purchasers that LaSalle introduced to VRC. Because LaSalle would not provide funds until it received the liquidation budget, VRC asked LaSalle whether it should provide tours and information to potential purchases or complete the liquidation budget. VRC states that LaSalle directed VRC to see to the potential purchasers first, then work on the liquidation budget; LaSalle disputes that it directed VRC what to do. On or about December 7, 2000, officers of LaSalle met with VRC at VRC's plant in Aurora, Illinois. At that meeting, VRC submitted the liquidation budget that LaSalle had requested. LaSalle was satisfied with the budget and, according to Lapides Sr., it told VRC that funding likely would resume that day. LaSalle disputes that it stated funding would resume.

On or about December 8, 2000, Durrel Corporation ("Durrel"), whom LaSalle had introduced to VRC, made an offer for and/or discussed a proposal with VRC. Lapides Sr. contends that this offer provided that none of VRC's outstanding unsecured creditors would be paid and VRC's current management team would be fired. LaSalle disputes this contention. On December 11, 2000, VRC filed a voluntary petition for relief pursuant to chapter 11 of the United States Bankruptcy Code. VRC's filing of the voluntary petition constituted an "Event of Default" under the Loan Agreement.

## Lapides Sr.'s Liability under the Guaranty

22

All of VRC's debt to LaSalle under the Loan Agreement, including the Specified Liabilities, became due and owing upon the expiration of the last Forbearance Agreement on November 20, 2000, and/or upon VRC's filing its chapter 11 bankruptcy case on December 11, 2000, thus triggering Lapides Sr.'s liability under the Guaranty for the Specified Liabilities. Pursuant to the Guaranty, Lapides Sr. acknowledged that LaSalle was authorized to:

(a) "renew, extend, accelerate or otherwise change the time for payment of, or other terms relating to, [VRC's] Liabilities;"

(b) "apply [its] security or collateral and direct the order or manner of sale thereof as in its sole discretion it may determine;" and

(c) "determine the time and manner of application of any payments or credits, whether received from [VRC] or any other source."

Also pursuant to the Guaranty, Lapides Sr. waived any defenses to enforcement of the Guaranty:

Guarantor hereby agrees that his obligations under this Guaranty shall be unconditioned, irrespective of . . . (viii) any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor.

Lapides Sr.'s liability to LaSalle under the Guaranty is the sum total of: (1) all principal and accrued interest with respect to the Term C loan; (2) the Over advance and (3) the Collection Costs. As of November 8, 2002, the total outstanding on Term Loan C, including all principal and accrued interest, is $1,888,582.79.

Pursuant to the First Forbearance Agreement (as defined below), the Overadvance is "the amount by which the sum of the principal amount of the Revolving Loans and Letter of Credit Obligations at such time exceed the Borrowing Base at such time." As of November 8, 2002, the principal amount of the Revolving Loans and Letter of Credit Obligations, as defined in the Loan

Documents, total $4,694,468.41.[7]

On January 9, 2002, substantially all of the assets of VRC were sold to a third party in accordance with that certain Order dated December 21, 2001 of the United States Bankruptcy Court for the District of Maryland. As a result of the January 9, 2002 sale, the Borrowing Base was reduced to $0.00. As of November 1, 2002, the total outstanding Overadvance is $4,694,468.41, the amount by which the outstanding principal amount of the Revolving Loans and Letter of Credit Obligations exceeds the Borrowing Base.

Pursuant to the Guaranty, the Collection Costs include all reasonable costs and expenses including, without limitation, all court costs and reasonable attorneys' and paralegals' fees paid or incurred by LaSalle in endeavoring to collect all or any part of the Specified Liabilities from, or in prosecuting any action against, Lapides Sr. As of November 8, 2002, the total Collection Costs that have accrued with respect to the Guaranty total $342,838.93. As of November 1, 2002, Lapides Sr.'s liability to LaSalle, calculated by adding all principal and accrued interest with respect to the Term C loan, the Overadvance and the Collection Costs, is $6,925,890.13.

### III. Discussion

In the Complaint, LaSalle seeks to enforce the Guaranty against Lapides Sr. for debts incurred by VRC in the amount of $6,925,890.13 as of November 1, 2002. Lapides Sr. acknowledges that VRC defaulted the Loan Agreement, which would trigger his obligations as guarantor, but he asserts affirmative defenses denying liability. Lapides Sr. also filed a counterclaim against LaSalle for tortious interference.

---

[7] For the purposes of this motion for summary judgment, LaSalle has not calculated interest that has accrued on the balance of the Revolving Loans, which would increase the amount owed by over $2 million as of November 1, 2002.

LaSalle moves for summary judgment in its favor on the Complaint and the

Counterclaim. As to the Complaint, LaSalle argues that (1) Lapides Sr. expressly waived any

and all defenses in the Guaranty; and (2) each defense is insufficient as a matter of law and fact.

As to the Counterclaim, LaSalle moves for summary judgment in its favor arguing that no

tortious interference claim can lie where, as here, LaSalle was merely acting in furtherance of its

own contractual rights with VRC. LaSalle further argues that, since VRC in fact paid Lapides Sr.

all principal and interest on Lapides Sr.'s personal loans, the Counterclaim fails as a matter of

law, as VRC never breached any agreement with Lapides Sr., a required element of tortious

interference. This Court addresses each argument in turn.

## A. The Complaint - Breach of Guaranty

Under Illinois law,[8] a plaintiff establishes a prima facie case for the enforcement of a

guaranty "when the plaintiff enters proof of the original indebtedness, the debtor's default, and

the guarantee." Mid-City Indus. Supply Co. v. Horowitz, 476 N.E.2d 1271, 1277 (Ill. App.

1985); see also United Airlines v. ALG, Inc., 912 F. Supp. 353, 357 (N.D. Ill. 1995). Here,

Lapides Sr. does not contest the existence of debt evidenced by the Loan Agreement, the default,

nor the Guaranty. Rather, Lapides Sr. asserts affirmative defenses, which would preclude

enforcement of the Guaranty. LaSalle counters that Lapides Sr. waived any and all defenses, and

---

[8] Neither party disputes that Illinois law applies, as both the Loan Agreement and Guaranty provide that Illinois law applies. In diversity cases, district courts follow the choice of law rules of the courts of the state in which they sit. Klaxon v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941). In Illinois courts, "the law applicable to a contract is that which the parties intended . . . . When that intent is expressed, it should be followed." H.B. Fuller Co. v. Kinetic Sys., Inc., 932 F.2d 681, 685 (7th Cir. 1991) citing Hofeld v. Nationwide Life Ins. Co., 322 N.E.2d 454, 454 (Ill. 1975). As Illinois courts would respect the parties' choice of Illinois law, so does this Court.

that, in the alternative, each defense is without merit.

1. Waiver of Defenses

Under Illinois law, where a contract of guaranty is unequivocal in its language, courts will construe it according to the language and intention of the drafting parties, even when the guaranty contains broad statements of guarantor liability. Chemical Bank v. Paul, 614 N.E.2d 436, 441 (Ill. App. 1993) (citations omitted). Covenant of good faith and fair dealing, however, is implied into every contract, absent express disavowal. Id. at 442.

LaSalle argues that summary judgment should be granted in its favor on their breach of guaranty claim, arguing that Lapides Sr. waived any and all defenses that he could assert against the enforcement of the Guaranty. LaSalle cites to language in the Guaranty that states the enforcement of the Guaranty is "unconditioned, irrespective of . . . (viii) any other circumstances which might otherwise constitute a legal or equitable discharge or defense of guarantor." As this language does not expressly disavow the covenant of good faith and fair dealing, and as guarantors cannot waive the right to commercial reasonableness, AAR Aircraft & Engine Group, Inc. v. Edwards, 272 F.3d 468, 472-73 (7th Cir. 2001), this Court finds that Lapides Sr. did not waive these two defenses in the Guaranty.

Even though Lapides Sr. did not waive these defenses in his Guaranty, LaSalle argues that Lapides Sr. nonetheless waived them because he did not plead bad faith or lack of commercial reasonableness as affirmative defenses. See Franklin Capital Corp. v. Baker & Taylor Entertainment, Inc., No. 99 C 8237, 2000 WL 1222043 at *3-4 ("The party asserting the 'bad faith' defense must specifically allege bad faith."). Indeed, the Federal Rules of Civil Procedure require that a defendant explicitly plead all affirmative defenses or waive the right to

26

rely on such arguments. Fed. R. Civ. P. 8(c). The purpose of this rule is to avoid surprise and undue prejudice to the plaintiff by providing the plaintiff with notice and the opportunity to demonstrate why the defense should not prevail. <u>Blonder-Tongue Labs, Inc. v. Univ. of Ill. Foundation</u>, 402 U.S. 313, 350 (1971). That being said, as long as a plaintiff has adequate notice of the defense and an opportunity to respond, failure to plead an affirmative defense can be harmless. <u>Venters v. City of Delphi</u>, 123 F.3d 956, 968 (7th Cir. 1997) (citing cases). In this case, as Lapides Sr. pled all the facts serving as the basis for these defenses in his Answer and Counterclaim, this Court finds that LaSalle had notice of the defense of bad faith and/or commercial unreasonableness. Thus, Lapides Sr.'s failure to plead these defenses is harmless and the Court will address them on the merits.

2. Lapides Sr.'s Affirmative Defenses

As a preliminary matter, this Court addresses the five affirmative defenses Lapides Sr. plead in his Answer: failure to state a claim, unclean hands, lack of consideration, duress, and fraud. While the Guaranty could be read to have waived these defenses, this Court addresses them on the merits because all of them fail as a matter of law. First, that the complaint fails to state a cause of action, is not only a "bare bones, conclusory allegation" that this Court can strike, <u>see Codest Engineering v. Hyatt Int'l Corp.</u>, 954 F. Supp. 1224, 1231 (N.D. Ill. 1996), but it also is patently without merit given that Lapides Sr. does not dispute the existence of debt evidenced by the Loan Agreement, the default, nor his Guaranty. Second, the unclean hands defense is an equitable defense that does not apply to claims, such as this one, for monetary relief. <u>LCI Int'l Telecom Corp., Inc. v. Am. Teletronics Long Distance, Inc.</u>, 978 F. Supp. 799, 802 (N.D. Ill. 1997) (holding that unclean hands is an equitable remedy and has no application in an action for

27

money damages); RIV VIL, Inc. v. Tucker, 979 F. Supp. 645, 659 (N.D. Ill. 1997) (same). Third, the defense of "lack of consideration" is without merit because (1) Lapides Sr. expressly recognized in the Guaranty that sufficient consideration had been provided; and (2) LaSalle's forbearance from exercising a right to take legal action against a VRC is adequate consideration as a matter of law, see City Nat. Bank of Hoopeston v. Russell, 615 N.E.2d 1308, 1312 (Ill. App. 1993).

Lapides Sr.'s fourth and fifth defenses, economic duress and fraud, are barred by the Illinois Credit Act, 815 ILCS 160 *et seq.* (the "Credit Act"). Courts have uniformly barred the claims and defenses of debtors which have relied on the existence of oral credit agreements. See Resolution Trust Corporation v. Thompson, 989 F.2d 942 (7th Cir. 1993) (court barred claims and defenses of debtor based on alleged oral promise of creditor to forgive unpaid balance of loan); Whirlpool Financial Corporation v. Sevaux, 874 F. Supp. 181 (N.D. Ill. 1994) (hereinafter "Whirlpool II") (court barred all claims and defenses relying on alleged oral promise to finance a loan); General Electric Capital Corporation, 1993 U.S. Dist. LEXIS 17690, No. 93 C 5614, 1993 WL 524814 (N.D. Ill. Dec. 15 1993) (court barred all claims and defenses related to an alleged oral agreement to extend or modify existing written credit agreements); McAloon v. Northwest Bancorp, Inc., 274 Ill. App. 3d 758, 654 N.E.2d 1091, 211 Ill. Dec. 281 (2d Dist. 1995) (court barred all claims and defenses founded on alleged oral representations by bank to lend money); First National Bank in Staunton v. McBride Chevrolet, Inc., 267 Ill. App. 3d 367, 642 N.E.2d 138, 204 Ill. Dec. 676, (4th Dist. 1994) (court barred all claims and defenses relying on oral promise of bank to hold a check overnight). The Credit Act bars all claims, whether sounding in contract or tort. First National Bank in Staunton v. McBride Chevrolet, Inc., 267 Ill. App. 3d at

372, 642 N.E.2d 142. Moreover, and importantly, the Credit Act is to be construed broadly to prohibit all claims arising from alleged extra-contractual representations, omissions or conduct in a credit relationship. McAloon v. Northwest Bancorp, Inc., 274 Ill. App. 3d 758, 762, 211 Ill. Dec. 281, 654 N.E.2d 1091, 1094 (2d Dist. 1995).

Presumably,[9] Lapides Sr.'s economic duress and fraud defenses are premised upon LaSalle's alleged duress and fraud in the procurement of the 13 Forbearance Agreements. Lapides Sr. asserts that LaSalle stated that it would not provide additional funding past the expiration of the Loan Agreement or a particular forbearance agreement unless VRC and/or Lapides Sr. executed another forbearance agreement. Such statements are precisely the type of extra-contractual representations that are barred by the Credit Act. See Westinghouse Elec. Corp. v. McLean, 938 F.Supp. 487, 493 (N.D. Ill. 1996) (economic duress claim barred by Credit Act).

The Court now addresses the defenses of bad faith and commercial unreasonableness. As stated above, every contract implies good faith and fair dealing between the parties to the contract. Martindell v. Lake Shore Nat'l Bank, 154 N.E.2d 683, 690 (Ill. 1958). Breach of the duty of good faith and fair dealing arises only when one party is "vested with contractual discretion" and exercises that discretion "arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectation of the parties." Bank One v. Roscetti, 723 N.E.2d 755, 764 (Ill. App. 1999). However, the "obligation of good faith that exists in every contractual relation" is

---

[9] Other than pleading economic duress and fraud as affirmative defenses, Lapides Sr. does nothing to establish these defenses. Indeed, in his Response he does not address LaSalle's arguments that these defenses fail as a matter of law; rather, Lapides Sr. merely addresses his bad faith/commercial unreasonableness defenses.

"not an invitation to the court to decide whether one party ought to have exercised privileges expressly reserved in the document." Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting, 908 F.2d 1351, 1357 (7th Cir. 1990). Rather, "good faith" is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting. Id.

With these principles in mind, this Court turns to Lapides Sr.'s claims. Lapides Sr. proposes numerous examples of how LaSalle acted in bad faith and failed to act in a commercially reasonable manner. First, this Court notes that, many, if not all, of the examples Lapides Sr. proposes are badly mischaracterized and/or not supported by the facts. Second, the claims that are supported by the facts, and therefore the only claims that this Court will consider, boil down to Lapides Sr.'s unhappiness with LaSalle's choice to exercise its privileges and/or rights expressly reserved in the documents. For example, Lapides Sr. asserts LaSalle acted in bad faith by imposing additional interest charges and other fees and by withholding funds until another forbearance agreement was signed. The Loan Agreement and/or Forbearance Agreements, however, provided for LaSalle to impose these fees. Thus, LaSalle was not acting in bad faith when it exercised its rights under these documents to impose higher fees and interest rates upon occurrence of certain events, i.e., default. Similarly, LaSalle did not act in bad faith or commercially unreasonably when it refused to disburse funds when a forbearance agreement expired. Indeed, upon the expiration of a forbearance agreement, which the parties freely negotiated, LaSalle was under no obligation to continue funding VRC at all. LaSalle's choice to refuse to disburse additional funds unless and until another agreement was in place was commercially reasonable and was not done in bad faith.

Lapides Sr. also asserts that certain "refusals" by LaSalle were done in bad faith and were commercially unreasonable. For example, Lapides Sr. asserts that LaSalle refused to allow VRC to pay out the over-advance portion of the revolving line of credit over an extended period of time, refused to allow VRC to refinance its debt with another lender, and refused to allow another lender to provide additional funding. The Loan Document and/or Forbearance Agreements did not require VRC to pay out the over-advance portion of the revolving credit over an extended period of time; thus, LaSalle's choice not to renegotiate the terms of the contracts is not bad faith, nor is it commercially unreasonable. Similarly, LaSalle did not approve GE Capital's proposal to refinance the debt or another lender's proposal for additional funding because LaSalle did not agree with the terms of those proposal. Namely, LaSalle did not want to retain a $3.0 - $3.5 million subordinated note, which the GE Capital proposal required, and it did not want to give up the equity in the loan, which the other lender was demanding. It is not bad faith or commercially unreasonable for LaSalle to opt out of deals it considers to be unfavorable. See Kham & Nate's Shoes No. 2, 908 F.2d at 1358 ("the Bank was entitled to advance its own interests, and it did not need to put the interests of Debtor and Debtor's other creditors first.").

Finally, Lapides Sr. complains of various terms in the Forbearance Agreements and Amendments, including the reporting requirements (which Lapides Sr. characterizes as "directing the daily activities of Lapides Jr."). These claims, however, amount to nothing more than Lapides Sr.'s dissatisfaction with the terms of the contracts. If Lapides Sr. did not agree to the terms of the contract, "the proper recourse is to walk away from the bargaining table, not sue for 'bad faith . . . .'" LaSalle Nat. Bank v. Met. Life Ins. Co., 18 F.3d 1371, 1375 (7th Cir. 1994) citing A/S Apothekernes Lab. v. I.M.C. Chemical, 873 F.2d 155, 159 (7th Cir. 1989). As this

Court finds that none of Lapides Sr.'s defenses are viable, summary judgment is granted in favor of LaSalle on its breach of guaranty claim in the amount of $6,925,890.13.

B. Lapides Sr.'s Counterclaim - Tortious Interference

LaSalle also moves for summary judgment on Lapides Sr.'s tortious interference counterclaim against it. Under Illinois law, the elements for tortious interference with contract are: (1) the existence of a valid and enforceable contract between plaintiff and another; (2) defendant's awareness of that contract; (3) defendant's intentional and unjustified inducement of a breach of that contract; (4) a breach of contract by the other was caused by the defendant's wrongful acts; and (5) damages to the plaintiff. Grund v. Donegan, 700 N.E.2d 157, 160 (Ill. App. 1998). Lapides Sr. claims that LaSalle tortiously interfered with VRC's repayment of Lapides Sr.'s Six-Month Loan Agreement and Revolving Note. The Lapides Loan, however, contained a subordination agreement. The Subordination Agreement precluded Lapides Sr. from receiving any payments on the Six Month Loan Agreement or the Revolving Loan Note until LaSalle was paid in full under the Loan Agreement.

However, Lapides Sr. argues that "LaSalle acted unreasonably and antagonistic to its own interest in collecting 100% of its loan to VRC" and that "these actions in turn made it impossible for VRC to perform its loan contract with VRH and Lapides Sr." In essence, Lapides Sr. argues that LaSalle's tortious interference with its *own* contract with VRC prevented VRC from repaying the Lapides Loan. Lapides Sr.'s claim fails for three reasons. First, Lapides Sr. expressly waived this type of claim in the subordination agreement to the Lapides Loan by agreeing that:

32

[LaSalle] shall be entitled to manage and supervise its financial arrangements with [VRC] without affecting the validity or enforcement of this Agreement and without regard to the existence of any rights that [Lapides] may now or hereafter have in or to any of the assets of [VRC];"

and:

[LaSalle] shall have no liability to [Lapides] for, and [Lapides] waives any claim which [Lapides] may now or hereafter have against, [LaSalle] arising out of (i) any and all actions which [LaSalle] takes or omits to take (including without limitation actions with respect to the occurrence of an Event of Default (as defined in the Loan Agreement)...."

Second, under Illinois law, a party generally cannot interfere with its own contract for the purposes of tortious interference with contract claim. Stanford v. Kraft Foods, Inc., 88 F. Supp. 2d 854, 856 (N.D. Ill. 1999). Third, even if a party could interfere with its own contract, for the reasons stated above, see supra III.A.2., LaSalle did not interfere with its own contract because this Court held that LaSalle did not act in bad faith or in a commercially unreasonable manner in its dealings with VRC and Lapides Sr. As Lapides Sr. fails as a matter of law to establish elements (3) and (4) of his tortious interference claim, summary judgment is granted in favor of LaSalle on the Counterclaim.

## IV. Conclusion

For the foregoing reasons, the Court GRANTS LaSalle's Motion for Summary Judgment in its entirety. LaSalle's motion to strike the jury demand is DENIED as moot. Judgment is hereby entered in favor of LaSalle and against Lapides Sr. on LaSalle's Guaranty Complaint in

the amount of $6,925,890.13. In addition, summary judgment is hereby entered in favor of LaSalle and against Lapides Sr. on the Counterclaim. This case is closed.

**Enter:**

David H. Coar

**David H. Coar**

**United States District Judge**

**Dated: February 27, 2003**